UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KRISTEN AARON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-03299-SEB-TAB |
| | ) | |
| ST. VINCENT ANDERSON REGIONAL | ) | |
| HOSPITAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment

[Dkt. 32] filed on October 18, 2018, pursuant to Federal Rule of Civil Procedure 56 and

Local Rule 56.1.  Plaintiff Kristen Aaron brings this action against her former employer,

Defendant St. Vincent Anderson Regional Hospital, Inc. ("St. Vincent"), alleging that she

was terminated because of her sex and disability in violation of the Civil Rights Act of

1964 ("Title VII") and the Americans With Disabilities Act ("ADA"), respectively.

Plaintiff also alleges that St. Vincent retaliated against her for exercising a statutory right

in violation of Indiana law.[1]  For the reasons detailed below, we <u>GRANT</u> Defendant's

Motion for Summary Judgment.

**Factual Background**

---

[1] In her Complaint, Plaintiff also alleged that she was terminated because of her age in violation
of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.  However, she
has abandoned that claim by failing to respond to Defendant's argument in support of its
dismissal.  Accordingly, Defendant's Motion for Summary Judgment is <u>GRANTED</u> as to
Plaintiff's ADEA claim.

*Plaintiff's Position and Job Duties*

St. Vincent is a hospital in Anderson, Indiana, that provides a wide range of healthcare services. Since 2007, St. Vincent has also offered a Clinical Program for Radiology ("the Program"). Radiology students in the Program study in both the classroom and clinical setting to become certified Radiology Technicians, also referred to as Medical Imaging Technologists ("Techs"). Ms. Aaron was first hired by St. Vincent in 1996 and became the Clinical Coordinator for the Program in July 2007.

As Clinical Coordinator, Ms. Aaron's primary job responsibilities included supervising the clinical education of radiology students, evaluating the students' progress in clinical areas, and maintaining professional educational requirements. Her duties also included, in relevant part:

- Promot[ing] the Radiology Program …

- Work[ing] closely with the Program Director, physicians, and other professional associates to provide in-depth and extensive training for students enrolled in the Radiology Program …

- [D]evelop[ing] and implement[ing] … program goals, program assessments, clinical objectives, and clinical evaluation system …

- Evaluat[ing] and facilitat[ing] clinical education effectiveness.

- Facilitat[ing] and/or provid[ing] appropriate and adequate clinical instruction for the students …

- Participat[ing] in meetings and serving on committees consistent with goals of the educational program …

- Provid[ing] or facilitat[ing] student guidance and academic counseling as appropriate …

- Report[ing] to the Radiology Program Director and Radiology Director.

Ex. 2 to Aaron Dep. at 2–4.

As the Clinical Coordinator, Ms. Aaron was also responsible for overseeing the relationship between the Techs and the radiology students in the clinical setting. Ms. Aaron supervised the students but had no managerial responsibilities over the Techs. She was responsible for the students' online computer testing and she performed their evaluations. Ms. Aaron taught classes, including patient care, positioning, ethics, and image evaluation. She spent time with the students, both in the classroom and the clinical setting, and she wrote tests and graded papers.

When Ms. Aaron first started as Clinical Coordinator, she reported to two Program Directors, Craig Mitchell and Mark Adkins. The Techs also reported to Mr. Mitchell. In 2009 or 2010, Ms. Aaron began reporting solely to Mr. Adkins, but the Techs continued to report to Mr. Mitchell until November 2016, when he transferred from St. Vincent. Mr. Adkins remained Ms. Aaron's supervisor until her termination on April 27, 2017.

*Plaintiff's Disability*

Ms. Aaron suffers from an autoimmune disease that causes gastroparesis, skin problems, joint and muscle pain, chronic fatigue, fibromyalgia, irritable bowel syndrome, and decreased kidney function. Compl. ¶ 6; Aaron Dep. at 103. While employed by St. Vincent, she never provided documentation or a written diagnosis of her autoimmune disease. Ms. Aaron also never reported that she was unable to perform any of her job duties due to any disability nor did she ever request any leave covered by the Family Medical Leave Act. Aaron Dep. at 35–36, 77, 103–04.

Ms. Aaron also did not seek any accommodation for any physical concerns, illnesses, or disability, other than a work space evaluation. In 2014, as a result of her chronic pain, she had her workspace evaluated by an occupational therapist, who made recommendations regarding the proper heights for her chair, desk, and computer monitor. Following the evaluation, Ms. Aaron was permitted to make the adjustments recommended by the occupational therapist. Ms. Aaron admits that she never made a request for any medical or physical accommodation that was rejected by St. Vincent. Aaron Dep. at 35–37, 77.

Mr. Adkins was aware that Ms. Aaron suffered from ongoing health issues and, according to Ms. Aaron, because she tried to schedule her personal medical appointments late in the day to limit the amount of work she missed, he "did not have a problem with it." Aaron Dep. at 31. Mr. Mitchell, however, made a comment to Ms. Aaron on one occasion in 2013, stating that her colleagues in the Program "were not happy with [her] not being there" due to her doctor's appointments. Aaron Dep. at 32. Thereafter, at Mr. Adkins's direction, Ms. Aaron began keeping a log to account for her time to protect herself from further complaints regarding her absences.

***Early Issues Within the Program***

Throughout Ms. Aaron's tenure as the Clinical Coordinator, animosity had existed between the Techs and the radiology students stemming from the circumstances surrounding St. Vincent's acquisition of the Program from another local hospital. Tensions between the two groups intensified throughout the years, and in 2013, an anonymous letter was sent to St. Vincent alleging that a radiology student who had left

the program the previous year had been "railroaded." Aaron Dep. at 29. The escalating tensions prompted Mr. Mitchell to schedule a meeting in December 2013 to discuss the situation with Ms. Aaron, a male clinical radiology instructor, and a female senior Tech. According to Ms. Aaron, at that meeting Mr. Mitchell said, "I'm tired of this shit. Work it out. If you don't work it out, we'll just end our affiliation with the program." Aaron Dep. at 11–13. Thirteen months later, following January 2015 meeting, Mr. Mitchell approached Ms. Aaron privately and told her she "would regret it if [she] did not side with him" at a future meeting. *Id.* at 47. Ms. Aaron reported these incidents to Executive Director of Operations Nick Theohares stating that Mr. Mitchell had "bullie[d] and threaten[ed]" her. Mr. Theohares took no disciplinary action in response to Ms. Aaron's complaint, responding only that Mr. Mitchell was "a good guy" and "didn't mean anything by the threats." *Id.* at 58.

### *Investigation into Techs' Complaints*

In the fall of 2016, Mr. Mitchell announced that he would be leaving St. Vincent for a new position. By that point, tensions between the Techs and radiology students had progressively worsened and, according to Ms. Aaron, the Techs were "very stressed" about Mr. Mitchell leaving and thus began to treat the radiology students even more poorly. Aaron Dep. at 39–40. Ms. Aaron spoke with Mr. Adkins in mid-October 2016 regarding the increased tensions and he instructed her to reach out to former students of the Program to collect their feedback regarding their time in the Program, particularly regarding "[h]ow the [Techs'] treatment towards the students was hostile." *Id.* at 41. Ms.

Aaron undertook that survey of former students shortly after this conversation with Mr. Adkins.

On October 27, 2016, a group of Techs contacted Amy Carey, Manager of Medical Imaging, to voice their concerns regarding the Program. In response, Ms. Carey contacted Mr. Theohares, requesting that he investigate the complaints raised by the Techs. The next day (October 28, 2016) Mr. Theohares convened a meeting with Ms. Carey, Mr. Mitchell, and eleven Techs to discuss the issues that had been raised, which included complaints concerning Ms. Aaron's behavior in creating a toxic environment for both Techs and students by sharing her "pre-conceived notions" about Techs with students before the students had an opportunity to actually meet with them. Exh. A to Theohares Decl. One of the Techs' chief complaints was that in reaching out to former radiology students to solicit feedback on their experiences with the Program, Ms. Aaron intentionally solicited negative feedback to serve as a basis to have them fired. The Techs also complained that Ms. Aaron spent most of her time in her office, did not understand how to operate the imaging equipment, and was rude towards them when they brought her their concerns. *Id.*

Following his meeting with the Techs, Mr. Theohares interviewed Mr. Adkins regarding these issues. Mr. Adkins disagreed with the Techs' assessment of the Program and their characterization of Ms. Aaron's role as creating discord between the Techs and students. He informed Mr. Theohares that Ms. Aaron had been soliciting feedback from former students at his (Adkins's) request and that in making that assignment he had the approval of the Executive Director of Medical Education, Dr. Jeffery Rothenberg. Mr.

Adkins stated that he supported Ms. Aaron "100%" and that he believed her complaint, to wit, that the students "are mistreated by the [T]echs and not respected." *Id.* Mr. Theohares expressed disapproval of Mr. Adkins's instruction to Ms. Aaron to gather feedback, promising to address the situation further at a later meeting.

Following his conversation with Mr. Adkins, Mr. Theohares compiled a Situation Background Assessment Recommendation ("SBAR") summarizing his investigation and setting forth his recommendations to St. Vincent President Michael Schroyer. Mr. Theohares concluded that Ms. Aaron's involvement had resulted in the Program's not serving the students well, which potentially affected student retention and the overall viability of the Program. In the SBAR, Mr. Theohares recommended three potential courses of action: (1) maintain the Program in its current state and address the identified issues; (2) reassign Ms. Aaron and bring in an instructor from a different site to address the identified issues; or (3) discontinue the Program at the Anderson site. *Id.*

### Investigation into Plaintiff's Complaints

On November 4, 2016, Ms. Aaron contacted St. Vincent's Human Resources Business Advisor, Jennifer Carolan, to complain as to the problems between the radiology students and the Techs. Specifically, Ms. Aaron reported that the Techs were rude and unprofessional toward the students, creating a hostile environment in the program. In her opinion, the students were receiving a poor experience and she felt caught in the middle of the dispute. Carolan Decl. ¶ 7. Ms. Aaron further informed Ms. Carolan that St. Vincent could lose its accreditation "if the students continued to be hazed or forced to stay in a hostile environment." Aaron Dep. at 50. In addition to her

concerns regarding the issues between the Techs and the students, Ms. Aaron also complained to Ms. Carolan about the treatment she had received from Mr. Mitchell, to wit, his threats to eliminate the Program affiliation and statements to her that she should side with him on these matters. Ms. Aaron reported that Mr. Mitchell, Mr. Theohares, and Senior Director of Human Resources Ross Brodhead comprised a "good old boys' club." Carolan Decl. ¶ 8.

Ms. Aaron raised additional concerns with Ms. Carolan about patient safety precipitated by an incident that had allegedly occurred a few days earlier. Apparently in response to Ms. Aaron's survey of former radiology students in search of evidence as to their experiences in the Program, the Techs feared that she was attempting to have them all fired. That rear resulted in their scheduling a meeting to discuss Ms. Aaron, during which, fortuitously, two radiology students overheard a call to the Techs requesting that a Tech respond to perform a "stat portable" on an emergency room patient. Aaron Dep. at 44. When one of the students entered the room where the Techs were meeting to inform them of the call, the student was told by a Tech, "Just get out." *Id*. A nearby ultrasound technician observed what had occurred and volunteered to perform the "portable," by which point approximately ten minutes had passed since the call was initially received. The two radiology students had reported the incident to Ms. Aaron. *Id.* at 45.

After her discussion with Ms. Aaron, Ms. Carolan interviewed the Techs and current students to verify these allegations. The Techs' list of complaints about Ms. Aaron included her not being available on the floors with students, that she was too friendly with the students and always took their side, that she created unwelcome drama

in the Program, that she coached students on their answers to Tech evaluations, pressuring them to criticize the Techs, that she warned students about the Techs and left the students with bad impressions of the Techs, that she changed scores the Techs had given to students on evaluations, and that she created a fear of retaliation, if Techs criticized students. Carolan Decl. ¶ 12. One of the Techs Ms. Carolan interviewed had previously been a student in the Program and though having positive things to say about the experience, had not been contacted by Ms. Aaron. This led Ms. Carolan to conclude that Ms. Aaron had reached out only to those students who had had negative experiences in the Program. *Id.* ¶ 11.

Ms. Carolan interviewed several radiology students who also raised concerns about the Program. The fact that they used some of the exact phrases Ms. Aaron had used when interviewed caused her to suspect that they had been coached in their responses. A number of students reported that Ms. Aaron had told them to maintain confidential written logs of the Techs' activities. *Id.* ¶ 10.

Based on her investigation, Ms. Carolan concluded that a hostile environment existed in the Program and that the Techs as well as the hospital administrators, namely, Mr. Adkins and Ms. Aaron, had not complied with St. Vincent's "Core Values." In her opinion, both groups were equally responsible for creating this negative situation. Exh. 4 to Aaron Dep. Ms. Carolan viewed Ms. Aaron's negative influence as "paramount" in that she supervised the daily interactions between the students and the Techs. Thus, her influence directly impacted the overall environment. Carolan Decl. ¶ 14. Ms. Carolan recommended that both sides meet in an attempt to improve the climate of the Program

through team building exercises.  Ms. Aaron's specific complaints regarding Mr. Mitchell's behavior, went unaddressed since he was no longer employed by St. Vincent.

When Ms. Carolan met with Ms. Aaron and Mr. Adkins near Thanksgiving to discuss her findings, both disagreed with her conclusions.  Thereafter, Ms. Carolan reported her findings to Mr. Theohares.

### *Plaintiff's Reassignment and Termination*

On January 17, 2017, Mr. Theohares convened a meeting with Mr. Adkins, President Schroyer, and Dr. Rothenberg to discuss the investigations that had been conducted into the conflicts between the Techs and the radiology students.  Ultimately, Ms. Aaron was determined to be primarily responsible for these problems prompting a decision to remove her from her coordinator role.[2]  Mr. Theohares supported the decision to remove Ms. Aaron from the Clinical Coordinator position based on the dissatisfaction and lack of trust reported to him by students and Techs.  Theohares Decl. ¶ 16.  President Schroyer viewed Ms. Aaron to have created a "toxic environment" in the Program by cautioning students about Techs, by requesting that students keep secret records of the Techs' conversations, and by pitting Techs and students against each other.  Schroyer Decl. ¶ 7.  Dr. Rothenberg agreed that Ms. Aaron was a "significant problem" for the

---

[2] There is some conflicting evidence in the record before us regarding whether Mr. Adkins had input into the decision to reassign Ms. Aaron.  *Cf.* Schroyer Dep. ¶ 8 ("Ultimately, Theohares, Rothenberg and I agreed to remove Aaron from the Coordinator role for the good of the Program.") *and* Rothenberg Decl. ¶ 9 ("Schroyer, Theohares, and I agreed Aaron should be removed from her position as Clinical Coordinator."), *with* Theohares Decl. ¶ 15 ("Ultimately, Schroyer, Adkins, Dr. Rothenberg, and I agreed to remove Aaron from the coordinator role for the good of the Clinical Program for Radiology.").

Program and that she needed to be removed as Clinical Coordinator. Rothenberg Decl. ¶ 8. According to Ms. Aaron, the concerns about daily logs completed by the radiology students to document the problems they encountered with the Techs were the responsibility of Mr. Adkins, not herself, because he had directed the students to do so. Thus, she was wrongly blamed for that decision. Aaron Dep. at 65.

Immediately following the January 17, 2017 meeting, Mr. Adkins met with Ms. Aaron to inform her that she was going to be removed from the Clinical Coordinator position at the Anderson site. St. Vincent transferred Ms. Aaron to its Indianapolis site to teach classes and assist the coordinator at that location thus affording her three months to find other employment within the Ascension network. Ms. Aaron received the same compensation and benefits in her reassigned position as she had received in her role as Clinical Coordinator. St. Vincent ultimately terminated Ms. Aaron, effective April 27, 2017, when she was unable to secure another position. St. Vincent hired Summer Cox (female) to replace Ms. Aaron as Clinical Coordinator in Anderson.

### The Instant Litigation

Ms. Aaron filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 5, 2017, alleging discrimination under Title VII, the ADA, and the ADEA and was issued a Right-to-Sue letter on June 23, 2017. Ms. Aaron filed her Complaint on September 18, 2017. Now before the Court is St. Vincent's Motion for Summary Judgment, filed on October 18, 2018.

## Legal Analysis

### I.   Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    Federal Claims

Ms. Aaron alleges that she was terminated because of her disability and her sex in violation of the ADA and Title VII, respectively. An analysis of these claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking

whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

## A. ADA Claim

The ADA, as amended, provides, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to … discharge of employees …." 42 U.S.C. § 12112(a). "To prove a violation of § 12112(a), a plaintiff must show that (1) [s]he is disabled; (2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by [her] disability." *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotation marks and citation omitted).

Here, the parties address only the third prong, to wit, whether Ms. Aaron's termination was caused by her disability; thus, we follow their lead and address only that prong as well. Where, as here, the parties have failed to argue that another causation standard should apply, the Seventh Circuit has held that "to establish the third prong and survive summary judgment, [the] plaintiff must show a genuine issue of material fact exists regarding whether [her] disability was the 'but for' reason for the adverse action, in this case termination." *Id.* at 504.

In order to prove that her termination was caused by her disability, Ms. Aaron can rely on either direct or circumstantial evidence. *Id.* As with most cases, there is no direct evidence of a discriminatory motive here. However, the Seventh Circuit has also recognized the following four types of circumstantial evidence on which a plaintiff may rely to provide a basis for drawing an inference of intentional discrimination: "(1)

13

suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (citing *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 684 (7th Cir. 2014)).

Based on our careful consideration of the record, we find that Ms. Aaron has failed to present evidence that would permit a reasonable jury to conclude that she was terminated because of her disability. Initially, we note that there is no evidence that any of the three primary decisionmakers, namely, Mr. Theohares, Dr. Rothenberg, or Mr. Schroyer, even knew that Ms. Aaron was disabled at the time they made the termination decision. Mr. Adkins was the only individual at that meeting who was aware of Ms. Aaron's medical issues. Even assuming that Mr. Adkins had some input into the decision to terminate Ms. Aaron, there is no evidence that her disability was the but-for cause of her termination.

Ms. Aaron argues that the proffered nondiscriminatory reason for her firing, to wit, her role in creating a negative learning environment for the radiology students and exacerbating tensions between the students and the Techs, was merely pretext for disability discrimination. She argues that St. Vincent's conclusion that she was to blame for the problems in the Program is unworthy of belief because it was based on an inadequate investigation by Mr. Theohares into the Techs' complaints against her and Ms. Carolan's unsupported finding that her (Aaron's) influence was "paramount" in creating the negative environment, even though it was Mr. Adkins who had directed her

to contact past students of the Program to collect their experiences and to instruct current students to keep logs detailing the Techs' actions.

To establish pretext, a plaintiff must do more than show merely that the employer's "stated reason was inaccurate or unfair." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 506 (7th Cir. 2014). Rather, a plaintiff must establish that the employer did not "honestly believe" the reasons it offered to explain its actions. *Id.* Pretext requires "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). Ms. Aaron has failed to make such a showing here. Although there may have been others whose conduct also negatively impacted the environment in the Program, there is nothing unworthy of belief about St. Vincent's determination that she was ultimately accountable, given that she, as Clinical Coordinator, was primarily responsible for overseeing the daily interactions between the Techs and the radiology students in the Program. While Ms. Aaron may believe that it would have been a better business decision to terminate Mr. Adkins, we do not operate as a "superpersonnel department that will second guess an employer's business decision." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).

The only other evidence proffered by Ms. Aaron in support of her ADA claim relates to an incident that occurred in 2013, approximately three years before she was terminated. According to Ms. Aaron, Mr. Mitchell approached her and told her that he had heard complaints from the Techs that she was out of the office too frequently for

doctor's appointments. This interaction, assuming its accuracy, is irrelevant, however, as Ms. Aaron has conceded that the complainants did not supervise her or play any role in her termination; likewise, by the time Ms. Aaron was terminated Mr. Mitchell had transferred away from St. Vincent and thus was not involved in the termination decision. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781–82 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision [at issue] are insufficient to defeat summary judgment.") (internal quotation marks and citation omitted).

Ms. Aaron maintains that following this interaction, she was asked by Mr. Adkins to keep a log of her time, which she contends was not required of two other non-disabled employees. Although preferential treatment of similarly situated comparators outside the plaintiff's protected can in some cases raise an inference of discrimination, Ms. Aaron has failed to set forth any argument that the two alleged comparators she has identified were similarly situated to her. She has not identified, for example, where those individuals worked, to whom they reported, or how their performance compared to hers to enable us to determine whether they are similarly situated comparators. *See Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 549 (7th Cir. 2017) ("'Similarly situated' means directly comparable in all material respects.").

In sum, considering the evidence as a whole, as we are required to do, no reasonable jury could find that Ms. Aaron's termination was caused by her disability. Accordingly, St. Vincent is entitled to summary judgment on her claim brought pursuant to the ADA.

## II.    Title VII Claim

Ms. Aaron also claims that she was terminated because of her sex, in violation of Title VII.  The basis of Ms. Aaron's claim is that a "good old boys' club" mentality existed at St. Vincent that was fostered by Mr. Theohares and that he, along with the other three male decisionmakers, decided to terminate her employment rather than hold one of their own—Mr. Adkins—accountable for the problems in the Program.  As with her disability claim, however, the evidence proffered by Ms. Aaron in support of this claim is insufficient to allow a trier of fact to find in her favor.

The fact that the decisionmakers in this case were all male, without more, is insufficient to prove discrimination.  Although Ms. Aaron argues that the men who decided to terminate her were all part of a "good old boys' club," the only specific incident she has cited to support that perception is her contention that Mr. Theohares on one occasion brushed off her complaint regarding Mr. Mitchell's perceived threats because Theohares knew Mitchell was "a good guy."  With regard to the other three decisionmakers, she has failed to offer any evidence, beyond her own speculation, that they displayed a similar attitude.  It is well-established that "[f]acts, not an employee's perceptions and feelings, are required to support a discrimination claim."  *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997).  Here, at most, the evidence might support an inference that Mr. Theohares had a "good old boys' club" mentality, but there are insufficient facts in the record to support an inference that any of the other decisionmakers shared that mindset.

The main thrust of Ms. Aaron's argument is that she was terminated, and Mr. Adkins was not, when he was the one who directed her to contact former students and have current students keep logs of the Techs' activities; this, she contends, is evidence of discrimination. Although evidence that similarly-situated employees outside the protected class received more favorable treatment can in some cases create an inference of discriminatory intent, Ms. Aaron has failed to show that she is similarly situated to Mr. Adkins in this case.

To be similarly situated for purposes of a Title VII action, "co-workers must be 'directly comparable to the plaintiff in all material respects, [though] they need not be identical in every conceivable way.'" *Moreland v. Nielsen*, 900 F.3d 504, 507 (7th Cir. 2018) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Generally, a Title VII plaintiff must show that her comparators "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citations omitted). The similarly situated inquiry "is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors … to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quoting *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007)).

There simply are not enough common factors shared by Ms. Aaron and Mr. Adkins to allow a meaningful comparison between the two. First, Mr. Adkins was Ms.

Aaron's direct supervisor. As the Seventh Circuit has recognized, "[t]his fact alone makes it difficult to conclude that two employees are similarly situated." *Poullard v. McDonald*, 829 F.3d 844, 855 (7th Cir. 2016). Ms. Aaron argues that both she and Mr. Adkins ultimately reported to Mr. Theohares and thus shared the same supervisor, but the evidence does not support that conclusion. Rather, the evidence establishes that Ms. Aaron reported to Mr. Adkins and Mr. Adkins reported to Mr. Theohares. Moreover, as discussed above, Ms. Aaron's job duties differed from Mr. Adkins's in a manner relevant to the reason for her termination, namely, that she was responsible for overseeing the daily interactions between the Techs and the radiology students. Although Mr. Adkins may have directed certain of her actions, ultimately it was Ms. Aaron's job—not Mr. Adkins's—to manage on a daily basis the relationship between the Techs and the students and it was that conduct that was cited by St. Vincent as its proffered basis for her termination. Accordingly, their conduct is clearly distinguishable. On the facts before us, we cannot compare the treatment of Ms. Aaron and Mr. Adkins for Title VII purposes as Ms. Aaron has failed to establish that Mr. Adkins is a similarly situated employee.

For the same reasons discussed in Part II.A. above, Ms. Aaron has also failed to present sufficient evidence to allow a reasonable jury to find that the proffered nondiscriminatory reason for her termination was pretextual. At most, Ms. Aaron might be able to show that St. Vincent made a poor business decision when it chose to terminate her employment instead of Mr. Adkins's. That is not, however, the standard for establishing pretext. *See Ferrill v. Oak Creek—Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017) ("'Pretext' is more than a mere mistake; it 'means a lie'—a 'phony

reason' for the employment action.") (quoting *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015)).

In sum, regardless of whether the evidence is considered under the burden-shifting framework or some other framework, it is insufficient to permit a reasonable jury to infer that Ms. Aaron was terminated because of her sex. Accordingly, St. Vincent is entitled to summary judgment on this claim.

## III.    State Law Retaliatory Discharge Claim

Ms. Aaron has also alleged in her Complaint that she was terminated in retaliation for exercising a statutory duty, in violation of Indiana law. Employment in Indiana is generally at-will, meaning that "the employer may discharge the employee at any time with or without cause." *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 212 (Ind. Ct. App. 2005) (citing *Coutee v. Lafayette Neighborhood Housing Servs., Inc.*, 792 N.E.2d 907, 911 (Ind. Ct. App. 2003), *trans. denied*, 812 N.E.2d 794 (Ind. 2004)). However, Indiana recognizes three narrow exceptions to the at-will doctrine, including, as is relevant here, "when clear statutory expression of a right or duty is contravened." *Ogden v. Robertson*, 962 N.E.2d 134, 145 (Ind. Ct. App. 2012). This exception originates from the Indiana Supreme Court's decision in *Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425 (1973). Under Indiana law, to be successful on a *Frampton* claim, a plaintiff must "demonstrate that his or her discharge was solely in retaliation for the exercise of a statutory right." *Purdy*, 835 N.E.2d at 212.

Here, Ms. Aaron alleges that St. Vincent terminated her in retaliation for her having reported conduct that could have resulted in the loss of accreditation for the

program she oversaw.  Compl. ¶ 33.  This allegation does not involve any statutory right, however.  In her brief in response to Defendant's motion for summary judgment, Ms. Aaron concedes as much, but requests that we "extend *Frampton* to provide protection to those who are terminated in retaliation for opposing and/or reporting the behavior of individuals who put the employment of an entire program in jeopardy."  Pl.'s Resp. at 15–16.  Ms. Aaron has not offered any persuasive basis to support her argument to expand *Frampton*, particularly given that, "[a]s a federal court exercising supplemental jurisdiction over this claim, we must be reluctant 'to expand state law' in this fashion." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1004 (7th Cir. 2006) (internal citation omitted).  Accordingly, this claim cannot survive summary judgment.

## IV.    Conclusion

For the reasons detailed above, we <u>GRANT</u> Defendant's Motion for Summary Judgment.  Final judgment shall be issued accordingly.

IT IS SO ORDERED.

Dated:  4/25/2019

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All electronically registered counsel of record